YAZOO & MISSISSIPPI VALLEY RAILROAD COMPANY *v.* R. W. LAMBUTH.

RAILROADS. *Injury to animal.    Wire fence.    Right of way.*

>    If a horse is frightened by a train and runs into a place rendered dangerous by the proximity of a wire fence, erected by the company's consent on the right of way, and a bluff of the cut in which the railroad is laid, and the danger is known to the engineer in charge of the train, and he can do anything which would save the animal from its peril and fails to do it, the company is liable for injuries to the horse resulting from contact with the fence.

FROM the circuit court of Franklin county.

HON. W. P. CASSEDY, Judge.

The facts are stated in the opinion of the court.

*Mayes & Harris,* for appellants.

The horse was never struck by the train—was grazing by the side of the track.    The engineer was under no duty to look out for him.    He did not see him, and the company cannot be held liable because the horse became frightened at the train, engaged at its usual business in the usual way, and, being frightened, ran into a wire fence and injured itself.    Under repeated adjudications of this state, the railroad company is not liable in this case. *Railroad Company* v. *Thornton,* 65 Miss., 256;  64 Miss., 637; 66 Miss., 3.

We think the railroad company violated no duty to the owner of the horse.    There was no negligence shown—no intentional wrong.    The engineer was not, under the repeated decisions of this court, required to keep a lookout for a horse grazing on the side of the road, and, being under no duty to see him, cannot be presumed to have seen him, and his testimony that he did not see him is absolutely uncontradicted.

The case cited by counsel for the appellee in their brief, in 82 Maine, has no sort of application to this case, as that case was decided under a special statute of Maine which made the railroad company liable for failure to keep a fence in repair to a penalty, and under which statute the railroad company was required to fence its track.   It has been repeatedly held in this state that the railroad company is under no duty to fence its track, and no duty to maintain a fence when it has been erected.

The other cases which counsel for appellee cite, which are cases from this state, are all cases in which the animals were actually struck by the train.

*Proby & Clinton*, on the same side.

The case at bar does not present such a question as was decided in the case of the *Illinois Central Railroad Co.* v. *Weathersby*, 63 Miss., 581, for the question in that case was, " whether the company was guilty of negligence in not stopping its train when the dangerous situation of the animal was discovered by its servants."   Therefore we submit that the general rule of law as laid down in 19 Am. & Eng. Enc. L., 941, that railroads are not responsible for injuries not caused by actual collision, is applicable to this case.

*Cassedy & Cassedy*, for the appellee.

The ground between the fence and the edge of the bluff is in the shape of a wedge, being wider at the entrance and growing narrower until at the point of the tragedy it is only about two feet from the fence to the edge of the bluff.   The fact that the fence had been down, leaving the "trap" open for a long time, was known to the defendant.   On the day of the tragedy the horse was feeding on the commons near the railroad track. The local freight came, the horse took fright and ran in between the wire fence and the track, there being nothing to prevent it, and proceeded on his way like a frightened horse would, the ground under him getting narrower and narrower, and the en-

gine coming closer and closer. At last he reached a point where the edge of the cut and the wire fence came almost together, and as the engine in the meantime had caught up with him, and was running alongside, he attempted to jump the wire fence and failed. He became entangled in the wire and died from his injuries. There was nothing to hinder the engineer or fireman from seeing him, and a glance at the horse and ground would have conveyed the idea to an ordinary mind that the horse was frightened, and was getting into a perilous position.

.The questions to be decided by the court are, first, was the company negligent in leaving open the gap after being notified that it was open and dangerous to stock? secondly, was the engineer negligent in the performance of his duty? Of course the train did not kill the horse, but the train and the open gap, the cut and the wire fence, combined, brought about his death. It is the duty of the engineer to take into consideration the nature of stock and their known habits, and exercise due care to avoid injury, self-inflicted as well as from actual collision. 64 Miss., 115. The evidence shows that when the engine started it was several hundred yards from the horse; it was emitting steam from the sides; the horse became frightened and ran into the ''trap,'' and the engine proceeded on its way. The engineer, under the circumstances, could have seen the horse had he exercised due care and looked ahead, or the fireman could have seen the animal, there being no obstruction, curve or bank, or anything to hide the horse. The question as to whether proper care was used is one of fact, and is for the jury, and was decided in favor of appellee. 68 Miss., 366.

STOCKDALE, J., delivered the opinion of the court.

This cause was in the circuit court of Franklin county, on appeal from justice's court, and R. W. Lambuth, plaintiff below, recovered judgment against appellants, defendants below, for $115 dollars and costs, and from that judgment this appeal comes here.

The record discloses that the right of way of appellant's road, north of the depot at Roxey, Franklin county, Miss., was conveyed to the grantor of said company by M. F. Byrd, reserving to himself the right to cultivate what was not in actual use by the company in operating its road; that, about one hundred yards north of the depot, two wire fences commenced, one at the west side and one at the east side of the right of way. These fences extended northward about a quarter of a mile, converging to a stock gap in the railroad track. Formerly, there was a trestle in the railroad track between the points where these two fences commenced, and a wire fence extended across under said trestle, connecting the south ends of said wire fences, thus forming a perfect inclosure, into which stock could not enter. The railroad company made an embankment of earth in place of said trestlework, and cut the said cross fence, leaving an open space through which stock could enter, but the side fences, and stock gap at the north end of them, remained, and there was no egress in that direction. Some distance north of where the said trestle and cross fence were, there is a cut through a hill for the railroad track, and the said wire fence, on the west side of the railroad, gradually approaches that cut until it touches, or comes very near, the bank (or bluff, as some witnesses denominate it), where it is five or six feet high.

The local freight train came from the south on appellant's road, and stopped at the depot at Roxey. At that time a horse of R. W. Lambuth was grazing near the side track north of the depot. The engine was cut loose, gave two blasts of its whistle, at which the horse became alarmed and ran north, going between said west wire fence and the cut until he arrived at a point where the two came together —the bank five feet high. The engine, with steam escaping from the stop cocks of both cylinders and from the dome, moved north in the rear of the horse and was about opposite him when he reached that point and about fifteen or twenty feet from him, and the horse, not being able to proceed

farther, became so frightened that he undertook to jump the wire fence and became entangled, and struggled until he was terribly cut and one limb broken and died. The engine never came in contact with the horse. The fence was on the right of way of appellants, and appellants' servants knew the situation of the fences and the cut and its banks. The fence was on the right of way by agreement of appellant with Byrd, as is shown by the deed of Byrd to appellant for the right of way. The charter of appellants'·grantor gave it the right of way, and, having that right, it bargained with Byrd for less right of way, giving him the right to use a part of that way. Certainly appellee had no hand in putting the fence and bank in the relative positions that resulted in the destruction of his horse.

There are two causes of error urged: (1) The court erred in refusing the peremptory instruction asked by defendants; (2) the verdict is contrary to law and the evidence. These were the causes assigned in the motion for a new trial. Appellant's counsel submit the proposition that the case at bar differs from *I. C. R. R. Co.* v. *Weathersby*, 63 Miss., 581, in that the engineer in this case swears he never saw the animal at all. Had the servants of appellant seen the appellee's horse running before the engine, into the place where he was killed, and not stopped the engine nor cut off the escaping steam, both of which could have been easily and quickly done, the facts in this case would have been stronger than the Weathersby case, and we might well declare as was there declared. The sole question is whether the company was guilty of negligence in not stopping its train when the dangerous situation of the animal was discovered by its servants. It must have been plain to anyone who saw the horse running between that fence and bank, frightened as he was, and the cause of his fright coming closer and closer behind him, that he would inevitably be injured. The testimony shows, beyond doubt, that the engine was running up the main track; that the horse was running up on the west side of the track, inside of the fence; that the train gained

steadily on the horse until it came opposite him; that he was off to the left side of the engine, about fifteen to twenty feet, running at great speed.

Thornton Anderson testified that the engine ran up beside the horse, and the engine and horse were running beside each other, and the "popping" off of steam was getting greater when the horse came to the bank, and he tried to turn around, and fell into the fence. "I saw the fireman swing himself out of the cab window after the horse went up the track." The horse was off to the left fifteen to twenty feet and forward of the engine at first. The engine then gained upon the horse, and ran up nearly beside him, the horse running in a great fright, and it is difficult to imagine how the fireman could avoid seeing him. The fireman was not put upon the witness stand to tell whether he saw the horse and told the engineer. The engineer was put on the stand, and testified that he was at his post of duty on the right of the engine, and did not see the horse. He did not say whether he was told the horse was running there, or knew it. Simply that he did not see him. He did not dispute any testimony delivered by any witness. The jury had the right to believe that the fireman saw the horse, and that he told the engineer, and probably did so believe, and found their verdict on account of the negligence of the servants of the company in not stopping the engine or cutting off the escape of the steam. That was a question proper for the jury to determine, and therefore the court did not err in refusing the peremptory instruction asked by defendants. The jury heard the witnesses, and we do not find in the record sufficient grounds to disturb the verdict, nor would we have disturbed it had it been for defendant. The judgment of the court below is

*Affirmed.*